## IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

TONYA CHERYL MOSES,                    *
                                       *
      **Plaintiff,**                        *
                                       *
-vs-                                   *CIVIL     ACTION     NO.     CV-05- 447
                                       *
ALLSTATE INDEMNITY COMPANY,            *
EDDIE WATTS, DEXTER WALDEN,            *
fictitious defendants A, B, C, D, and E, *
being those persons, companies,        *
partnerships, or other entities who caused *
or contributed to cause the injuries and *
damages alleged herein through their   *
negligent and/or intentional conduct   *
and/or who are the successors in interest *
to any of the named Defendants and/or  *
who had supervisory control or the duty *
to supervise any of the named Defendants *
and F, G, H, I and J, said fictitious  *
defendants being those corporations,   *
partnerships, other business entities or *
other individuals who conspired with the *
named Defendants to further the conduct *
described in the complaint and/or who  *
acted either independently or participated*
with others to commit the wrongful     *
conduct complained of herein, whose    *
name or names are unknown to the       *
Plaintiff at this time but which will be *
substituted by amendment when          *
ascertained,                           *
                                       *
      **Defendants.**                       *

FILED IN OFFICE.
2005 NOV 14 PM 2:43
CIRCUIT/DIST. COURT
RUSSELL CO., AL

## COMPLAINT

### STATEMENT OF THE PARTIES

1.    Plaintiff Tonya Cheryl Moses is an adult resident citizen of Russell County,

Alabama.

2.    Defendant Allstate Indemnity Company (hereinafter referred to as "Allstate") is a foreign corporation doing business in Russell County, Alabama.

3.    Defendant Eddie Watts is an adult resident citizen of Jefferson County, Alabama whose address for service is 2600 Corporate Drive, Birmingham, AL 35242. At all times pertinent hereto, Defendant Watts was doing business in Russell County, Alabama and was acting as an agent or principal of the other named Defendants.

4.    Defendant Dexter Walden is an adult resident citizen of Russell County, Alabama whose address for service is 1418 14th Street, Phenix City, AL 36867. At all times pertinent hereto, Defendant Walden was doing business in Russell County, Alabama and was acting as an agent or principal of the other named Defendants.

5.    Fictitious defendants A, B, C, D, and E are those persons, companies, partnerships, or other entities who caused or contributed to cause the injuries and damages alleged herein through her negligent and/or intentional conduct and/or who are the successors in interest to any of the named Defendants, and/or who had supervisory control or the duty to supervise any of the named Defendants whose names are not known to the Plaintiff at this time but which will be substituted by amendment when ascertained.

6.    Fictitious Defendants F, G, H, I and J, are those corporations, partnerships, other business entities or other individuals who conspired with the named Defendants to further the conduct described in the complaint and/or who acted either independently or participated with others to commit the wrongful conduct complained of herein, whose name or names are unknown to the Plaintiff at this time but which will be substituted by amendment when ascertained.

7.    All actions complained of herein took place in Russell County, Alabama.

2

8.    The Defendants have sufficient contacts with the State of Alabama and Russell County to allow jurisdiction and venue to be asserted over them by this Court. The policy of insurance at issue in this case was sold by the Defendants in Russell County, Alabama. Defendant Allstate has policies of insurance in full force and effect in Russell County, Alabama. The claim at issue involves a house located in Russell County, Alabama.

9.    Plaintiffs bring this action solely under Alabama law.

10.    Certain of Plaintiffs' factual and legal allegations are made in the alternative as allowed by the <u>Alabama Rules of Civil Procedure.</u>

## STATEMENT OF FACTS

11.    On or about February 18, 2004, the Plaintiff purchased a policy of insurance to insure her home from Defendant Allstate. Defendant Walden sold the policy of insurance to the Plaintiff. In consideration of the premium paid to it by the Plaintiff, Allstate issued a contract of homeowner's insurance, bearing policy number 9-15-205026-02/18, which was in full force and effect at the time of the loss at the insured premises at 601 14th Avenue South, Phenix City, Alabama 36869.

12.    The Plaintiff's contract of insurance extended coverage for her dwelling and personal property if her home was damaged by an insured peril.

13.    In September of 2004, the Plaintiff's home was damaged by Hurricane Ivan. Wind and hail damage are insured perils under the policy. The Plaintiff called Defendant Allstate and reported the claim. Defendant Watts was assigned as the adjuster to the claim.

14.    The Plaintiff received an estimate relating to the damage to her roof from independent roofing contractors based in the Russell County area. The contractor determined that her roof was damaged and needed to be replaced due to hail and/or wind damage.

3

15.    The Defendants essentially denied the Plaintiff's claim, contending that the damage was not related to hail or wind damage and allowing a claim on the roof damage in the amount of $506.37.  The estimate to replace the roof by the Phenix City-area contractor was for $3,447.00 plus the cost of repairing the interior damage to the home.

16.    After the loss, the Plaintiff requested that the Defendants pay them in full for her damage, but the Defendants failed and refused to pay the aforementioned damage, despite knowing that they were required to do so.

17.    Defendants Watts denied the claim on the basis that there was no additional damage to the home and that the $506.37 was sufficient to cover all of the damage.  Mr. Watts had absolutely no basis for making such a determination.  Likewise, the Defendants had no basis for the denial of the claim.

18.    The Defendants were under an affirmative duty to pay the Plaintiff the full value of her loss under her policy of homeowners insurance but failed to do so.

19.    The Plaintiff purchased this insurance policy, and continued to pay premiums on the policy, upon the representations made by Allstate that they were in "Good Hands" with Allstate.

20.    After the storm, the Plaintiff's home was severely damaged by hail and wind.  Her roof was a total loss from hail striking the roof and/or from wind damage.  Despite clear evidence of the total loss of her roof and severe damage to her home, Allstate refused to fully compensate the Plaintiff for her loss.  Its refusal to pay was based upon the use of a fraudulent claims policy employed by Allstate on a nationwide level.  The claims policy is known as CCPR (Claims Core Process Redesign).

21.    The purpose of CCPR is not to ensure proper claims handling procedures by

4

Allstate claims representatives. Rather, CCPR is designed to increase growth and profitability for Allstate Insurance Company at the policyholders' expense.

22.     The Plaintiff, just like all other Allstate policyholders, never knew about Allstate's use of CCPR.

23.     At no time was the Plaintiff aware of Allstate's use of the consulting firm, McKinsey & Company.

24.     Prior to her purchase of the insurance policy, the Plaintiff, as well as all other Allstate policyholders, was unaware of McKinsey & Company's employment by Allstate and its role in reducing claims payments. The Plaintiff was not aware of Allstate's radical new approach to claims handling - an approach that violates the traditional, legal definition of good faith and fair dealing. This fact was suppressed by Allstate and Walden when the Plaintiff purchased the policy and during the period of payment of her premiums.

25.     Allstate Insurance Company and Walden make every effort to conceal the presence of these documents from its policyholders. This fraudulent concealment is, in large part, a basis of the Plaintiff's claim and is the reason why the Plaintiff was unaware of the institutional bad faith practices at Allstate.

26.     Like other Allstate policyholders, the Plaintiff did not know that the CCPR process was being utilized in the handling of her property loss claim or that Allstate had test marketed the CCPR Roof Process in several neighborhoods across America. They did not know that Allstate redesigned its claim handling protocol to pit itself as an adversary against all its policyholders. They did not know of Allstate's expressly stated goal of the recapture of $475 million in yearly net income from the use of CCPR. This information and all other information about CCPR and its economic goals were suppressed from the Plaintiff, the stockholders and the

5

policyholders of Allstate Insurance Company.

27.     Allstate employed the CCPR Roof Process in the handling of his claim. By using CCPR, Allstate has a stated purpose of increasing growth and profitability, and increasing her competitiveness in the insurance industry. All of this is done at the expense of, and to the detriment of, policyholders such as the Plaintiff.

28.     When she purchased the policy in question, and at all times thereafter, Allstate and Walden failed to inform the Plaintiff that Allstate had instituted a new claims procedure for handling claims, including roof claims. Since she lives in an area of heavy and frequent storm involvement, she would not have purchased the policy had she known of this unlawful and unreasonable claims process for assessing hail and storm damage.

29.     Allstate's use of the CCPR Program is not made known to prospective policyholders before their purchase of an Allstate Homeowner's policy. Moreover, the CCPR Program is directly contrary to Allstate's representations to customers that they "are in Good Hands with Allstate."

30.     Allstate also owns Tech-Cor. This is a company utilized by Allstate to teach its adjusters how to underpay roof claims. Allstate, Walden, Tech-Cor and McKinsey & Company have all conspired to defraud Allstate policyholders, including the Plaintiff, by suppressing the use of these processes from potential Allstate customers and Allstate policyholders. The processes are specifically designed to underpay claims and thus unjustly enrich Allstate Insurance Company by unlawfully increasing her profitability and growth.

31.     In an attempt to sell policies, trust and credibility to potential customers, Allstate inundates the television, radio, magazines and newspapers with representations that policyholders of Allstate are "In Good Hands." These representations are directly contrary to

6

Allstate's use of the Zero Sum Game in the claims handling process. This game represents Allstate's direct competition with its policyholders.

32.    Purchasing insurance is equivalent to purchasing a peace of mind. Allstate's new approach to claims handling ensures that policyholders will have anything but. More likely, an Allstate policyholder is destined to endure years of protracted litigation, mental anguish and time consuming, costly litigation.

33.    The Plaintiff neither knew, nor could have known, of these secret claims handling procedures. She could not have known that these processes were responsible for dramatically increasing Allstate's profits at the expense of policyholders. She could not have known that Allstate planned for its redesign to result in an increase of between $375 million to $475 million per year in net income. Moreover, she could not have known that Allstate intended to use protracted and expensive litigation as a weapon against them and other policyholders in order to defeat the payment of his claim.

## INTRODUCTION TO CORE CLAIMS PROCESS REDESIGN

34.    Allstate Insurance Company, in an effort to increase its profitability and competitive standing in the insurance industry, created a radical new approach to claims handling. It was known as CCPR, or Core Claims Process Redesign. The express and stated purpose of CCPR was to increase growth and profitability, thus increasing Allstate's stock values.

35.    Core Claims Process Redesign was the brain child of Allstate's collaboration with McKinsey & Company.

36.    McKinsey & Company consults with Fortune 100 companies. The purpose of their consulting work is to teach businesses how to increase their efficiency and profitability.

7

37.    This is a perfectly legitimate goal in American business circles. However, when McKinsey's approach is applied to the insurance business, the final result is anything but legitimate.

38.    The implementation of CCPR was based upon McKinsey's use of Gaming Theory.

39.    According to this theory, a zero-sum game is a game in which one player's winnings equal the other player's losses. Put another way, one party to a transaction must lose and one party must win.

40.    McKinsey & Company developed gaming strategies for competitive businesses which were very popular in the 1980's. While the Zero Sum Game Theory has legitimate applications in the normal business world, it has no business in the world of insurance claims practices.

41.    Out of the gaming theory concept was born the Claims Core Process Redesign. According to McKinsey & Allstate, the new approach to claims handling would be that one party, the policyholder, must lose, and one party, the insurance company, must win.

42.    Under traditional insurance principles, the insurance company acts as the fiduciary and trustee for the policyholder. In exchange for the payment of premium dollars from the policyholder, the insurer gives a promise to hold the funds in trust and pay all legitimate claims that arise. If there is money left over in the trust fund after all claims are paid, then it belongs to the insurance carrier.

43.    As the fiduciary and trustee of the funds, the insurance company is not allowed to act in a manner to maximize its profits at the expense of the insureds. McKinsey & Company, using gaming theory, taught Allstate that, in order to maximize profits, Allstate would have to

8

radically alter longstanding insurance principles and institute a "New Game."

44.    The collaboration between Allstate and McKinsey & Company began in 1992 and continued through 1997, with some final adjustments of the process during its implementation in key markets in 1997 and full-blown implementation in the national market in 1998.[1]

45.    This aggressive competition with its policyholders represents a radical departure from the underlying principles of insurance wherein the insurer is a trustee of funds for the policyholder and promises to pay all claims for benefits that arise under the policy of insurance.

46.    It is important to point out, right from the start, that senior Allstate management was fully behind the use of CCPR.

47.    The Homeowner Implementation Manual, along with the McKinsey Documents, also proves the existence of McKinsey & Company's involvement in the redesign of Allstate's claims practices.

48.    The overall results of CCPR for Allstate's bottom-line have been amazing. According to investor publications on Allstate's website, Allstate has seen an increase in profitability in the amount of $15 to $25 billion. Allstate credits CCPR for this unprecedented and phenomenal growth. Allstate does not tell its policyholders or shareholders what CCPR is or does.

49.    In terms of roof claims, Allstate determined that one of the largest areas of economic opportunity, outside of water claims, is in the area of wind and hail claims for roof damage. Allstate enlisted the services of Tech-Cor, a company which Allstate owns, to assist

---

[1]    The CCPR process is used universally by Allstate for all adjusters in every market in the United States, including the Alabama market.

Allstate in the calibration of its roof process.[2]

50.    The positive results for Allstate after the initial run of the Roof Process for CCPR were astonishing.  The severity, or average amount paid for a certain type of claim, went down almost 50%.  The number of CWP's, or Close Without Payment, increased by more than 50%. In other words, Allstate found that it could pay much less and close more files without any payment whatsoever.[3]

51.    Allstate makes every effort to conceal the use of CCPR from its customers. Allstate will only produce CCPR documents in litigation when there is a protective order. Allstate contends that such documentation constitutes trade secrets and that these documents are proprietary in nature.  This documentation is not shared with Allstate policyholders either at the point of sale or at the time of the handling of a claim.

52.    Another disturbing characteristic of CCPR is Allstate's intent to use the American civil justice system to realize its goals.  Allstate determined that aggressive litigation tactics would result in prohibitive litigation expenses which would, in turn, decrease the payout to the insured and send a clear message to the plaintiff's bar that litigating against Allstate makes it economically unfeasible to pursue claims any further.

53.    In a first-party claim, the policyholder is bringing a claim against Allstate.  In a third-party situation, a person injured by a policyholder is making a claim.  Obviously, the third-party claimant would be in an adversarial position with the insurer.  However, Allstate treats the first-party claimant, i.e., the policyholder, exactly like they treat the adversarial claimant.

---

[2]  Calibration refers to the process by which Allstate ensures that all of its claims representatives, all across the country, are handling claims in the same manner.

[3]  The initial test runs were in Albuquerque, New Mexico, Phoenix, Arizona, Denver, Colorado, and Dallas Texas.

54.    The insurer is supposed to give equal consideration to the policyholder's interests as it does its own. Allstate is treating the policyholder as an adversary in every situation. This is the basis of the Zero Sum Game being played by Allstate and is the clearest possible evidence of an institutional practice of bad faith conduct at Allstate Insurance Company.

55.    Allstate also ties the performance of its adjusters to the amount of money that they pay out in claims. The less that they pay, the more that they receive in compensation from Allstate. This process is known at Allstate as "Paid to Evaluated."

56.    The "Paid to Evaluated" measurement was designed by McKinsey to ensure compliance among adjusters with the radical new approach to claims handling. This measurement was necessary because initial studies of CCPR determined that too many adjusters were still following the old claims protocols at Allstate which called for giving fair treatment to the policyholders.

57.    The method used to ensure compliance with the New Game of CCPR was to tie employment compensation to the average amount paid on claims by Allstate adjusters. This is the essence of "Paid to Evaluated."

58.    Another important change in policy by Allstate was SFXOL ("Settle for X or Litigate"). "X" was the value Allstate's new computer program, Colossus, placed on each claim. Adjusters were not allowed to exceed that fraudulent number. If they did, the "Paid to Evaluated" measurement tool would punish any adjusters whose settlement figures rose above the Colossus values. Incidentally, this was also a driving force in Allstate's insistence upon prohibitively expensive and aggressive litigation tactics as a means to lower claims payments.

59.    The success of this strategy is amply demonstrated in the financial performance of Allstate since the implementation of CCPR. Her surplus increased from $4.62 billion in 1995 to

11

$22.5 billion in 2005.

60.    "SFXOL" is the ultimate expression of Allstate's new game approach.  Either

defer to the insurance juggernaut with practically limitless resources or get hammered with the

"Boxing Gloves" in litigation with aggressive litigation tactics.  Or, as Allstate saw it, settle for

our amount, "X," and get the "Good Hands."

61.    The Plaintiff's claim was evaluated using CCPR.  It is clear that the Plaintiff is

not getting the "Good Hands" but instead is getting the "Boxing Gloves."

## COUNT ONE

## BREACH OF CONTRACT

62.    The Plaintiff realleges all prior paragraphs as if set out fully herein.

63.    The insurance contract at issue imposed the duty on Allstate to adequately

compensate its insureds for all damages that are covered by the terms or conditions of this

policy.

64.    Notwithstanding the foregoing, the Defendant failed to promptly pay the balance

due under the Plaintiff's policy and breached the contract of insurance.

65.    Upon information and belief, the Defendant acted in a similar fashion in regard to

hail storm claims and property losses that occurred during the same period in Alabama and

across the nation.  (See Introduction to CCPR, herein above).

66.    As a direct result of Defendant's breach of the insurance contract, the Plaintiff has

been financially damaged and continues to suffer damage and loss.

67.    The Plaintiff performed all matters and items properly required under the

insurance policy as a condition precedent to this action or, alternatively, has been excused from

performance by the acts, representations, and/or conduct of the Defendants which constitutes a

waiver and/or estoppel of all such conditions precedent to recovery.

68.    As a further result of Defendants' breach of these insurance contracts, it has become necessary for the Plaintiff to incur and become obligated for a reasonable attorney's fee and costs incurred for the prosecution of this case.

69.    The Plaintiff suffered property damage to the roof of her home. She was covered by a policy of homeowners insurance issued by Defendant Allstate. The Plaintiff gave timely notice of her property damage claim to the insurer.

70.    Without a proper investigation or justification, the Defendant refused to pay for the Plaintiff's property damage claim or failed to act seasonably on said claim.

71.    By failing to pay and properly investigate the Plaintiff's property damage claim, the Defendant breached the contract of insurance.

72.    The insurance contract at issue imposed the duty on Allstate to adequately compensate its insured, the Plaintiff, for all damages that are covered by the terms of conditions of the policy.

73.    The motive for the breach of contract was Allstate's use of CCPR and their stated intent to recapture $425 million per year in net income.

74.    As a proximate consequence of the breach of contract, the Plaintiff was injured mentally, emotionally, and financially.

13

## COUNT TWO

### BAD FAITH REFUSAL TO PAY A JUST CLAIM

75.    By placing its own financial interests above those of the policyholder, Allstate acted in a manner inconsistent with her "Goods Hands" policy and inconsistent with the implied covenant of good faith and fair dealing found within the policy of insurance.

76.    The Defendant's refusal to fully pay said claim was not based upon any reasonably legitimate, arguable, or debatable reason.

77.    When Allstate refused to fully pay said claim, it knew there was no legitimate, arguable, or debatable reason for doing so.

78.    The Defendant intentionally failed to determine whether or not there was any lawful basis for the refusal to fully pay said claim.

79.    The Defendant acted in bad faith in refusing to fully pay said claim and in failing to properly investigate the claim.

80.    The clear motive behind the bad faith denial of the Plaintiff's claim, and all of the wrongful acts of Allstate, is to recapture $425 million per year in net income and increase the value of Allstate's stock.

81.    As a proximate consequence of the bad faith, the Plaintiff was injured and damaged.

## COUNT THREE

### FRAUDULENT SUPPRESSION

82.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

14

83.    The Defendants Allstate and Walden had an affirmative duty to inform the Plaintiffs of the employment of the consulting firm McKinsey & Company, the creation and results from CCPR, and of the involvement of Tech-Cor in the claims handling process.

84.    McKinsey & Company was employed by Allstate to assist them in unlawfully lowering claim indemnity costs, pendings and expenses. In other words, McKinsey was hired to teach Allstate to pay less on claims, regardless of the merit of any individual claim and to identify economic opportunities in the claims handling process whereby Allstate and its adjusters could pay less on claims that should have been paid or were only partially paid.

85.    The result of the exploitation of the policyholders has been a $475 million increase in net income for Allstate as well as a profit of $25 billion.

86.    Allstate insureds, including the Plaintiff, were never informed of this unlawful scheme and fraudulent conduct. Had she known, the Plaintiff would not have purchased the policy in question.

87.    The Defendants Allstate and Walden had an affirmative duty to inform the Plaintiffs that it employed the use of McKinsey's Zero Sum Game, CCPR, and the other fraudulent practices spawned by McKinsey's consulting services. CCPR creates a clear conflict of interest between the insurer and the policyholder that does, and should not, exist under the original principles of insurance claims handling.

88.    Allstate, Walden, and Watts had an affirmative duty to inform the Plaintiff about this conflict of interest. She was not aware when she purchased the policy that CCPR and gaming theory was being used by Allstate in the handling of claims.

15

Moreover, they were not informed of Allstate's intent to subjugate the judicial process to her stated purpose of using aggressive litigation tactics to force the acceptance of lower claim payouts and to send a message to claimants that, if they chose full compensation, they would receive the "Boxing Gloves" rather than the "Good Hands." The Plaintiff would not have purchased the policy in question if she had known the true facts.

89.    The Defendants, including Defendant Watts, also suppressed from the Plaintiffs its use of the CCPR Program in the adjustment of this loss and in the adjustment of roof damage claims at Allstate.

90.    All of these suppressed facts were material facts which, if the Plaintiff had known said facts, she would have purchased a policy of insurance from another insurer and would not have continued to pay premiums to Allstate.

91.    If policyholders were told that Allstate intended to use aggressive litigation tactics, redesign the claims process, and engage in an "Allstate must win, the policyholder must lose" claims philosophy, insureds such as the plaintiffs, would not have purchased insurance through Allstate. No insured would intentionally purchase a lawsuit when they are seeking to purchase peace of mind and a transfer of risk in exchange for a premium. Allstate suppressed the existence of CCPR, its goals and purposes of increasing profits at the expense of the trust fund created for the payment of claims, her collaboration with McKinsey and Tech-Cor, and other information stated in the above Statement of Facts that was material to the risk of the Plaintiff's educated and informed purchase of insurance.

92.    The Defendant negligently, recklessly and/or intentionally suppressed this information from the Plaintiff.

16

93.    As a proximate consequence of this fraudulent conduct, the Plaintiff was injured and damaged.

## COUNT FOUR

### BREACH OF FIDUCIARY DUTY

94.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

95.    Allstate Insurance Company and its agents, including Defendant Walden, represent to policyholders and potential policyholders that they are "In Good Hands with Allstate." This advertising campaign is designed to influence potential customers and create a feeling of trust and confidence in the insurance company.

96.    The Plaintiff purchased this policy of homeowners insurance, in part, because of this marketing campaign. These advertisements inspired confidence in the Plaintiff that Allstate would act in good faith and in his interest during the handling of any potential claims that she might have under the policy of insurance.

97.    The Plaintiff was unaware, at the time of the purchase of the policy, that Allstate engaged in the practice of employing a consulting firm for the express purpose of unreasonably and unlawfully lowering claim payments. She was also unaware of Allstate's use of the CCPR Program, the Zero Sum Game and the "Boxing Gloves" treatment that Allstate intended to use on first-party claimants who did not give in to Allstate's aggressive tactics.

98.    The Plaintiff was also unaware that Allstate was using the judicial process to force the acceptance of lower claim payouts to policyholders. Allstate was using its superior financial position to foster aggressive litigation practices against all

policyholders and claimants foolhardy enough to take on Allstate's billions in reserves. Allstate used the court system as a weapon to force claimants to accept lower benefits which should have been paid under the policy and to send a clear message to the legal community.

99.    At all times during her purchase of this policy and during the claim process, the Plaintiff, as an average consumer unskilled in insurance matters, was in an inferior position of bargaining power.  Allstate had knowledge vastly superior to the Plaintiff's own about insurance matters and claims handling practices.

100.    Allstate and Walden took advantage of the Plaintiff's inferior bargaining power and lack of knowledge about insurance industry terminology and practice.

101.    The Defendant Watts had a fiduciary duty to the Plaintiff to insure that her claim was handled properly and timely and was paid in accordance with the terms of her policy.

102.    The Defendants Allstate, Walden, and Watts had a fiduciary duty to the Plaintiff at all times as a result of her relationship as insured and insurer.

103.    Each of the Defendants breached this duty.

104.    As a proximate result, the Plaintiff was injured and damaged.

### COUNT FIVE

### FRAUDULENT FAILURE TO PAY CLAIM

105.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

106.    The Defendants fraudulently refused to fully pay the Plaintiff's claim.

107.    The Defendants knew that the claim was the result of hail and/or wind

damage. Nonetheless, the Defendants concealed from the Plaintiffs the use of CCPR, the use of the McKinsey & Company consulting firm, the employment of Tech-Cor, the "Boxing Gloves" treatment of first-party claimants and the huge profits that Allstate was making from underpaying policyholders.

108.    These material facts should have been disclosed to the Plaintiff and were not. These material facts were suppressed with the express intent to deceive the Plaintiff. This constitutes fraudulent conduct.

109.    As a proximate consequence of this deceitful and fraudulent conduct, the Plaintiff was injured and damaged.

## COUNT FIVE

### CONSPIRACY

110.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

111.    The Defendant Allstate conspired with McKinsey and its agents and adjusters, including Walden and Watts, to create and implement the CCPR process and to conceal this material information from the public and its policyholders, as well as various state insurance commissioners.

112.    The Defendant Watts and Allstate conspired to improperly deny the Plaintiff's just claim for their own benefit, because incentives and rewards were offered to the Defendant Watts for the improper denial of the Plaintiff's claims.

·113.    As a proximate consequence of this deceitful and fraudulent conduct, the Plaintiff was injured and damaged.

## COUNT SIX

## UNJUST ENRICHMENT

114. The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

115. Allstate Insurance Company has been unjustly enriched in the amount of approximately $425 million in net income per year since at least 1997. Allstate proudly proclaims surpluses of $25 billion and credits CCPR with the huge and unprecedented gain in profits.

116. Allstate has been unjustly enriched by her fraudulent conduct. Hardworking policyholders have been deprived of premiums and subjected to Allstate's "Boxing Gloves" treatment. This conduct flies directly in the face of the entire premise of insurance; a promise for a premium. Allstate failed to keep that promise. They have been unjustly enriched as a result and should be required to disgorge these ill-gotten gains back into the hands of the policyholders that they took it from.

117. Defendant Watts was unjustly enriched because of the rewards that were given to him for the improper denial of the Plaintiff's just claim.

118. As a proximate result of Defendants' unjust enrichment, the Plaintiff has been injured.

### COUNT SEVEN
### NEGLIGENT AND/OR WANTON HIRING, TRAINING, AND/OR SUPERVISION

119. The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

120. Defendant Allstate negligently hired, trained, and/or supervised its agents and employees so that they were allowed to negligently and/or wantonly suppress

material facts from the Plaintiff, as set forth above, and so that they were allowed to negligently and/or wantonly file and process the Plaintiff's claim.

121.    As a result of the Defendant's negligence and/or wantonness, the Plaintiff was injured and damaged as alleged above.

122.    To the extent that the Defendant's conduct was wanton, that conduct is such as to allow the imposition of punitive damages to punish this Defendant and to deter the others similarly situated from such conduct in the future.

## COUNT EIGHT
## BAD FAITH REFUSAL TO INVESTIGATE A CLAIM

123.    The Plaintiff realleges all prior paragraphs of the Complaint as if set out fully herein.

124.    Defendants Watts and Allstate failed or refused to adequately investigate Plaintiff's just claim.    There was no justifiable basis for this failure or refusal to investigate.

125.    Defendants Watts and Allstate committed bad faith in their failure or refusal to adequately investigate Plaintiff's claims.

126.    As a result of the Defendants' bad faith failure to investigate, the Plaintiff was injured and damaged as alleged above.

127.    To the extent that the Defendants' conduct was intentional and/or wanton, punitive damages are allowed to punish these Defendants and to deter others similarly situated from such conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

> A.    In such an amount of compensatory damages as will reasonably and adequately compensate her for her injuries and damages;

21

B. In such an amount of punitive damages as will reflect the enormity of the wrongs committed by the Defendants and will deter the Defendants and others from committing similar wrongful acts in the future;

C.    Her costs in this action; and,

D.    Such other relief as this Court finds is appropriate.

_____
Christina D. Crow
Lynn W. Jinks, III
Nathan A. Dickson II
Attorneys for Plaintiff

OF COUNSEL:

JINKS, DANIEL & CROW, P.C.
Post Office Box 350
Union Springs, AL  36089
334-738-4225

JOSEPH G. STEWART, JR., P.C.
P. O. Box 911
Montgomery, AL  36101-0911
(334) 263-3552

**JURY DEMAND**

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

_____
OF COUNSEL